In the Matter of SAMUEL SELIGSOHN, an Attorney, Respondent.

First Department, January 10, 1930.

*Isidor J. Kresel* [*Theodore B. Richter* and *Sidney Handler* with him on the brief], for the petitioners.

*John J. O'Connell*, for the respondent.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York in October, 1915, at a term of the Appellate Division of the Supreme Court of the State of New York, First Department.

The petition charges, on information and belief, that the respondent has been guilty of misconduct as an attorney at law as follows:

(a) For many years last past the respondent herein was engaged in the solicitation of contracts and retainers from persons injured in accidents, retaining and authorizing him to act as their attorney to collect damages sustained by them as a result of such accidents, and to bring suits at law in their behalf to recover such damages.

(b) For many years last past the respondent employed divers persons, not members of the bar of the State of New York, who, with his knowledge and approval, solicited and procured contracts and retainers from persons injured in accidents, retaining and authorizing him to act as their attorney to collect damages sustained by them as a result of such accidents and to bring suits at law in their behalf to recover such damages, and the respondent paid or promised to pay the persons so employed by him various sums of money as salaries, fees, commissions or compensation for the service rendered by them in soliciting and procuring said contracts and retainers.

(c) For many years last past respondent promised and gave divers persons, not members of the bar of the State of New York, valuable considerations for inducing persons injured in accidents to retain him as their attorney for the purpose of bringing actions or suits in their behalf to collect money damages claimed to have been sustained by them as a result of said accidents or to represent said claimants in the pursuit of their civil remedies for the recovery of their claims.

In the petition there are set out seven specific instances of solicitation. On the hearing of the charges before the referee

testimony as to two other specific instances of solicitation was offered.

In addition to these charges of solicitation, the petition charges that the respondent, in three specified instances, failed to obtain court approval for settlements and failed to properly account for moneys which he had received in infants' cases.

The charges were referred to a referee who has made his report wherein he exonerates the respondent of the offenses charged against him.

Petitioners oppose the confirmation of the referee's report and claim to have established the guilt of the respondent in the following matters:

(1) The Watson case. This was an infant's case. The testimony of the mother, Katherine Watson, shows that her son, Creighton Watson, was injured on July 16, 1926, and was taken to Fordham Hospital. Within two hours after she had taken her son home from the hospital, Max Kushner called at her home and told her that he had been sent by Mr. Seligsohn to see if Mr. Seligsohn could get the case. Kushner gave her one of respondent's cards. Mrs. Watson testified that Kushner told her that Dr. Scott from Fordham Hospital phoned to Mr. Seligsohn about the accident. At that time Mrs. Watson knew neither Kushner nor the respondent. On this occasion, Mrs. Watson testified, her husband signed " the paper." After that they were called to Seligsohn's office, " once for a doctor's examination and once to settle the case."

(2) The Murphy case. This, too, was an infant's case. The testimony of the mother, Margaret Murphy, shows that her son, Richard Murphy, was injured about four or five years ago. About four days after the accident Max Kushner came to her home and asked her if she wanted to give the case to him. She did not know either Mr. Kushner or respondent. She signed a paper retaining Mr. Seligsohn and the case was subsequently settled.

(3) The Schulman case. Another infant's case. Ida Schulman testified that her son, Morris Schulman, was injured about four years ago. He was taken to a hospital, and an officer brought him home, but she was not there. She testified: " They brought him in my place; so they did not find me there and they brought him to my mother's house, and so after my mother called me I came to my mother's house and I found him there." She found an officer and another man there. She had never seen the other man before that time. She testified: " Q. What did they say? A. He give me a card and he wants to take the case; that is all he said. Q. You mean the other man? A. Yes." She gave him

the case and respondent became her attorney. Afterwards the case was settled and she went to Mr. Seligsohn's office at that time.

(4) The Roth case. Also an infant's case. Adolph Roth testified that he was injured in April, 1925. He was taken to Bellevue Hospital in a taxi. When he awoke in the taxicab there was a policeman sitting with him. Roth testified: " Q. Did you have a talk with some one about giving your case to a lawyer? A. Yes, sir. The officer said he was going to send someone down to my house. Q. When did he say this? A. On the way back. Q. Back from where? A. Well, when I came out of the hospital he said he was going to send someone down to my house. That was before I got in the cab." Some one came to Roth's house the following day or two days later; said he came from Samuel Seligsohn's office, showed him Seligsohn's card, and said the officer sent him down. Two or three weeks later Roth went to Seligsohn's office and had a doctor examine him. The case was settled.

(5) The Perryman case. Robert Perryman testified that he had been injured in the fall of 1924 in the subway at One Hundred and Thirty-fifth street and Lenox avenue; that " just on the subway the young man who helped me, after I fell on the subway, he asked me if he could send his lawyer up to see me." Perryman testified that he did not know who the young man was, he had never met him before. The record then shows the following: " Q. What did you tell him? A. I tell him yes, he may send him up. Q. Did some one come up? A. Yes, sir. Q. Who came up? A. Mr. Seligsohn. Q. The gentleman sitting here at this table? A. Yes, sir. Q. What did Mr. Seligsohn say to you? A. He asked me to let him handle the case. Q. How long after the accident did Mr. Seligsohn come up? A. It was some time in the evening, I suppose about three or four hours. Q. That is, three or four hours after you had been hurt? A. Not more. * * * Q. What did Mr. Seligsohn say to you? A. He said since I had the accident I should let him take the case. Q. Did he offer you any reasons why you should select him rather than some other attorney? Mr. O'Connell: I object to that as immaterial. The Referee: Allowed. [Exception taken by Mr. O'Connell.] A. Why, he told me he had been successful in those cases, and he said let him handle the case and he would make every effort to see that I get justice. Q. Did he show you anything? A. He had some newspaper clippings to show that he had been successful in past cases. Q. Did you sign a paper then? A. I think I did. Q. A retainer? A. I think I did, I am not sure." The case was afterwards settled.

Respondent's explanation of the Perryman case is as follows:

" I was called up one day, I think it was a Saturday, by a Mr. Elliott, who was a brother-in-law of a former client of mine whose name was Moses.   *   *   *

" Mr. Elliott called me up and informed me that a friend of his, some one he knew in the neighborhood, had been injured, and that he thought an attorney was necessary in the matter and that Mr. Perryman had asked him to communicate with an attorney he knew, and thereupon I personally, it being a Saturday afternoon, went to the house, met Mr. Elliott there, Mr. Perryman and Mrs. Perryman."

Perryman could not remember either of the names Elliott or Moses, and could not remember that he had a friend by either name.

(6) The Swain case. An infant's case. Anna Swain testified that in August, 1925, her son Robert was injured. He was taken to Harlem Hospital, where he stayed two hours, when she took him home. When she came back from the hospital there were two gentlemen whom she had never seen before. They asked her if she would let them have the case, and she said not just then. They came back two or three days later and finally got her to sign two separate papers. They were there about three times before she signed. Samuel Seligsohn came the second or third night, she was not quite sure; he came with one of the gentlemen who were waiting for her on the first occasion when she came back from the hospital. After she signed the retainer she went to Seligsohn's office.

As to the Swain case, respondent testified: " Q. How did you come to go up to her place [Mrs. Swain's], if it was at her place that the retainer was signed?   A. I received a telephone call — that is there was a message in the office that Mrs. Swain would like to see me. I went up to the house, spoke to her, saw the injured child, and she retained me as her attorney in the case." His testimony is that she gave him the retainer personally, and there was present a party by the name of Mr. Joseph Longo, who was the superintendent of one of the adjoining buildings. Respondent testified that Longo was superintendent in one of the adjoining houses; that he recommended respondent and respondent was called up. He testified he knew Longo because he had a Longo case. But his testimony as to the nature of such case is vague. It is also interesting to note that on the examination in the investigation before Mr. Justice WASSERVOGEL, respondent testified that the source of the Swain case was an Italian named Fulucci.

On the charge of failure to obtain court approval for settlements, and failure to properly account for moneys received, in infants' cases, the record shows:

(1) The Murphy case (wherein Max Kushner obtained a retainer for respondent).   Two claims were asserted, one for the infant, and one for the parent.   The two claims were settled for $150.   The retainer provided for payment to respondent of fifty per cent of the recovery.   On the settlement, however, respondent gave the parent $90.   Respondent testified that of his own volition he changed the retainer to thirty-three and one-third per cent.   The settlement was on the basis of $100 in the infant's case and $50 on the mother's case.   Respondent testified that the mother agreed to contribute $10 out of her share toward his disbursements.   An application was made to the Supreme Court for leave to settle the infant's claim.   In his affidavit in support of the application for leave to compromise, the respondent stated that his fee in the mother's case was $16.66.   His failure to disclose the agreement as to the $10 contribution toward disbursements is explained by respondent as follows: " What I mean to say is this: that what I had in mind at the time was that my $16.66 was to be for the services.   If I did not put it in it was one of those human frailties that both accuser and accused sometimes are subject to."   In granting leave to compromise, the court fixed respondent's fee in the infant's case at $20, and this was " inclusive of disbursements." (See interlineation by justice who signed the order, Petitioner's Exhibit 2.)   Therefore, respondent was entitled to add no more than $20 to the amount agreed upon between himself and the mother, according to his testimony, viz., $26.66, making a total of $46.66.   Respondent's explanation for withholding $60 is as follows: " My interpretation of that was this, and I think I am giving you my honest feeling in the matter at that time, that when I told her about the $10 that was at the time that the papers were prepared, when I asked her and she said yes.   That order was signed and I got $20 instead of $33.33.   Mrs. Murphy came down for her check upon my request and I said: ' Mrs. Murphy, you expected to get $90.   I note here that the court instead of allowing me one-third has cut it down to $20.'   And her answer to me at that time was, ' Mr. Seligsohn, you have done the right thing by me.   You have been fair with me.   I expect to get $90 and that difference of $13 you can take out of my share.'   That is what she said."

Mrs. Murphy, recalled, testified that she remembered nothing about any such arrangement.   She testified: " All I know that Mr. Seligsohn said there was $150 coming to me, that was the best he could do and that that was — as the other man said, Mr. Kushner, it was 50–50, and I figured it was $75.   Then when I went to go down to get the check off of him I seen the $90 and I

signed for the $90, but as to giving any money or saying to take any money, I didn't say anything like that."

Mrs. Murphy testified she was satisfied with the settlement.

(2) The Albrektsen and Schulman cases. In these infants' cases the respondent prepared and submitted to the Municipal Court orders approving compromises in which was omitted the provision fixing the attorney's fees. Respondent's explanation for this is that in previous instances justices of the Municipal Court had stricken out from orders submitted by him the direction fixing the amount of his fees; that such orders had been submitted on his behalf by Kushner, and that Kushner had reported to him the striking out of the direction by the justice. It may be significant to note that notwithstanding the failure of the proposed order to provide for the fixing of the fee, respondent's supporting affidavit did request the court to fix the fee, in both the Albrektsen and the Schulman cases.

Section 474 of the Judiciary Law (as amd. by Laws of 1912, chap. 229) provides:

" § 474. Compensation of attorney or counsellor. The compensation of an attorney or counsellor for his services is governed by agreement, express or implied, which is not restrained by law, except that no agreement made hereafter between an attorney and a guardian of an infant for the compensation of such attorney, dependent upon the success of the prosecution by said attorney of a claim belonging to said infant, or by which such attorney is to receive a percentage of any recovery or award in behalf of such infant or a sum equal to a percentage of any such recovery or award, shall be valid or enforceable unless made as hereinafter provided. An attorney may contract with the guardian of an infant to prosecute, by suit or otherwise, any claim for the benefit of an infant for a compensation to said attorney dependent upon the success in the prosecution of such claim, subject to the power of the court, as hereinafter provided, to fix the amount of such compensation. Whenever such a contract shall have been entered into between an attorney and a guardian of an infant, upon the recovery of a judgment, or the obtaining of an award in behalf of the said infant, or upon any compromise or settlement of such claim, the attorney may apply, upon notice to the guardian, to the judge or justice before whom the said action or proceeding was tried, in case the said action or proceeding was tried at a court held within this State; or to a Special Term of said court, in case the said action or proceeding was tried before some person other than a justice thereof, or said claim was compromised or settled after said suit was begun, or in case of the death or disability of

the judge or justice before whom the action was tried; or to Special Term of the Supreme Court in case the recovery, award, compromise or settlement was not had in any court of this State; such application shall set forth briefly the contract, the services performed by the attorney and pray that there be awarded to him a suitable amount out of the recovery, award, compromise or settlement obtained through his efforts as attorney on behalf of the infant; the court to which such application is made, upon being satisfied that due notice of the said application has been given to the said guardian, shall proceed summarily to determine the value of the services of said attorney, taking such proof from either the attorney or the guardian by affidavit, reference or the examination of witnesses before the said court, as to the said court may seem to be necessary and proper, and shall thereupon make an order determining the suitable compensation for the attorney for his services therein, which sum shall thereafter be received by the said attorney for his services in behalf of the said infant; and no other compensation shall be paid or allowed by the guardian for such services out of the estate of said infant. If a copy of such order awarding the compensation with notice of entry be thereafter served by the said attorney upon the adverse party to the said litigation or the person making such compromise or settlement and upon the custodian of the funds recovered, in case there be such custodian, such award shall become and constitute a lien to the amount thereof on behalf of the said attorney upon such recovery, award, settlement or fund."

As to Max Kushner, respondent testified: "He was process server, he was a clerk making entries in the diary; he filed papers in court, served papers on attorneys; he investigated a matter, a negligence case, seeing the witnesses; if a client or friend of mine had a case to recommend and called up the office he was assigned to see the client to find out if there was a justifiable claim, and if there was to procure a retainer in which I was retained as attorney for the injured party. If a person was injured in a tenement house it was his duty to go to the Registrar's office and obtain the name of the owner. During trials it was his business to be in court and have the witnesses there. He was a Commissioner of Deeds; he was an errand boy when I needed him for such purposes."

Respondent denied that he paid Kushner a percentage of any case in his office at any time. Respondent testified that at the time Kushner was first employed his salary was thirty dollars a week, and during the three years he was with respondent he received two or three increases, so that at the time he left he was receiving a salary of forty dollars a week.

There is no direct evidence of payment by respondent to any person employed by him to solicit and procure contracts and retainers (other than the salary paid to Kushner), as charged in subdivision (b) of paragraph V of the petition. Nor is there any evidence of the promise or giving of valuable considerations to divers persons for inducing persons injured to retain respondent, as charged in subdivision (c) of paragraph V of the petition.

The record sustains the charge of solicitation as set forth in subdivision (a) of paragraph V of the petition, as evidenced by the testimony in the Watson, Murphy, Schulman, Roth, Perryman and Swain cases.

Respondent failed to properly account in the Murphy infant case, as charged in paragraph V, subdivision (k). The fact that the mother expressed satisfaction on the settlement might be urged in mitigation, but the record shows that she was uninformed as to the court's direction, and her attitude does not justify respondent's conduct.

Respondent deducted his fees in the two infants' cases of Albrektsen and Schulman, without having the court fix his fees, as required by section 474 of the Judiciary Law, as charged in subdivisions (l) and (m) of paragraph V of the petition.

In soliciting, as charged in subdivision (a), paragraph V, of the petition, respondent violated canon 28 of the Canons of Professional Ethics, which reads:

" 28. Stirring up Litigation, Directly or Through Agents. * * * It is disreputable to * * * breed litigation by seeking out those with claims for personal injuries or those having any other grounds of action in order to secure them as clients, or to employ agents or runners for like purposes, or to pay or reward, directly or indirectly, those who bring or influence the bringing of such cases to his office, or to remunerate policemen, court or prison officials, physicians, hospital attachés or others who may succeed, under the guise of giving disinterested friendly advice, in influencing the criminal, the sick and the injured, the ignorant or others, to seek his professional services. * * *."

The circumstances surrounding the solicitation in the instances in the record are not merely suspicious, they are symptomatic of a practice which cannot be defended. It is urged on behalf of respondent that his cases were legitimate, that none of them was " fraudulent, manufactured or dubious," that no client has been cheated, and that no client has been dissatisfied with his treatment. The petition here does not concern itself with the character of respondent's clients' claims, nor with his method of dealing with such clients, except in the Murphy infant case.

We have here, then, a characteristic case of what is commonly denominated " ambulance chasing," and which was thus condemned by the Court of Appeals in *Matter of Clark* (184 N. Y. 222): " * * * Nor is there anything in the suggestion that the employment of such paid emissaries is essential to the protection of the poor, who else might not become aware of their right to prosecute remedies in the courts for wrongs which they may have suffered. The permission which the law now gives to attorneys to serve clients for a contingent fee is sufficiently well known throughout the community to enable any one, however limited his means, to secure adequate professional service in the enforcement of any meritorious claim in the courts. It is not necessary for the protection of the poor to sanction the practice which, as applied to negligence cases under the name of ' ambulance chasing ' has brought deserved discredit upon those engaged in it; and in any event, if the views which have been expressed are correct, the law denounces the practice as criminal."

The learned referee apparently was not in sympathy with the investigation of ambulance chasing, nor with the prosecution of charges for acts disclosed thereby. We expressly repudiate and disapprove his views as expressed in paragraphs 7, 8, 9, 10, 11 and 12. The proper rule in regard to these practices was clearly and forcibly enunciated by Presiding Justice LAZANSKY in *Matter of Rothbard* (225 App. Div. 266).

The learned referee has acknowledged that in reaching his conclusions " he was influenced by the respondent's preliminary training, his experience, his standing among trustworthy acquaintances who knew him well, the impression which he made upon the referee while on the stand, and the absence of material gain as creating improbability of intent to do wrong." He also finds that respondent had handled over 600 negligence cases, and that he " might well have established " a reputation as a negligence lawyer thereby. But none of the witnesses referred to knew of him by reputation, or even by name, but only because of the activity of his clerk and a physician and a police officer in soliciting business for him.

The matters referred to by the learned referee do not go to respondent's guilt, which we find proven in the cases enumerated above, but to the punishment to be administered to him. It appears that he has discontinued the handling of negligence cases since the end of 1927, and such cases when they now come to him are handled by another attorney under an agreement for the division of fees. The respondent is also shown to have always borne a good character.

While we cannot overlook the offenses committed by respondent, they are not as grave or numerous as others which have been brought to our attention. We think the interests of justice will be served by the suspension of respondent for one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions to be incorporated in the order to be entered hereon.

MERRELL, FINCH, McAVOY and O'MALLEY, JJ., concur.

Respondent suspended for one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.