In the Matter of HARRY E. KREINDLER, an Attorney, Respondent.

First Department, March 10, 1930.

*Isidor J. Kresel* of counsel [*Harold I. T. Schnurer* and *F. Sims McGrath* with him on the brief], for the petitioners.

*John Caldwell Myers* of counsel [*Harold M. Hoffman* with him on the brief], for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York at a term of the Appellate Division of the Supreme Court of the State of New York, Second Department, on June 17, 1919.

The petition herein charges that the respondent has been guilty of misconduct as an attorney at law as follows: Solicitation of retainers from individuals having claims for personal injuries (with specific instances of solicitation set out in the petition), representing clients with false claims, and misappropriation of client's money. Respondent answered raising an issue as to these charges and the matter was referred to a referee to take testimony in regard to the charges and to report the same with his opinion thereon. The referee has duly reported and the respondent moves to confirm the report.

The referee in his report recommends that all of the charges be dismissed. The petitioners contend that the charge ·of solicitation by a salaried investigator has been established, and oppose the confirmation of the report of the referee in that respect. No opposition is made to the report in so far as it recommends the dismissal of the other charges.

The investigator, who the petitioners contend was proven to be a solicitor for respondent, is Mrs. Theresa Braun. Respondent testified that in August, 1925, he employed this woman as a part time investigator at a salary of twenty-five dollars a week. In March, 1926, on an arrangement whereby she was to give her entire time, he agreed to pay her fifty dollars a week. The duties assigned to her were, in respondent's words, " Well, she was assigned to investigating work. She was assigned to work requiring the interviewing of witnesses, interviewing of plaintiffs, interviewing of scenes where the accident happened, if it happened to be an accident case; she was assigned to work of tracing debtors in some of my New York Title & Mortgage Company cases, and other commercial cases. She was assigned to see plaintiffs who called up and wanted my personal presence at their homes, and she relieved me of considerable of that work." Respondent admitted that Mrs. Braun recommended cases to him. He testified that, according to the lists prepared by his stenographer, such cases numbered thirty-seven or thereabouts in 1926, and twenty in 1927. Mrs. Braun left his employ in April, 1928. The testimony of respondent regarding his procedure when a case was recommended to him by Mrs. Braun is as follows: " Q. By the way, did you ever give Mrs. Braun any blank retainers to take with her when she was out investigating? A. Not unless she was told by me to go to see some person who desired to retain me in a particular matter. Q. But you gave her no retainers for solicitation purposes? A. Of course not. Q. What practice did you follow when Mrs. Braun informed you that she had recommended a client to you? A. Well, I wanted to know what the facts were before I made up my mind as to whether or not I cared to handle the matter, and if I found that I could take the case I told her I thought it was perfectly all right, then she went up there and saw the plaintiff. Q. And then when you told her that, would you give her a retainer to be signed? A. No, I would not give her a retainer; she would go over to Miss Petlin and get the retainer and probably take it along."

Mrs. Braun testified that she had been in the second-hand clothing business since 1914, and also sold new clothes on the installment plan, and had done a great deal of investigating before being employed by respondent. She testified that she spoke seven lan-

guages, that she belonged to different societies and was well known in her neighborhood, or to use her own words, " I am pretty near as well known as Tom Farley " (Mr. Farley being the present sheriff of New York county and Democratic leader of his district). Mrs. Braun would have us believe that it was not necessary for her to ask for cases, that people knew she was working for a lawyer, and when people were injured either the injured persons themselves or their friends got in touch with her. The record discloses a number of instances where that was really the fact. On the other hand, the testimony in many cases is that the injured person made no request to have a lawyer or representative call but Mrs. Braun did call and urged and secured the retainer for respondent.

Edward Heime testified that in 1926 he had an accident in which he was injured falling down some stairs at 402 East Seventy-eighth street. He testified: " Well, about three days after I was hurt I had my arm bandaged up and was standing by the door with my dog. Some woman in the house — I lived there three years; I don't know who she was — about this accident, because this was right opposite where I fell from where I lived, and she saw I was not driving a car, and she asked me what the trouble was. I told her, and then I think that same evening some woman come up to the house — she said I am going to send somebody up to see you about a lawyer. I didn't want to bother right away, because this arm was hurt previous anyhow; I didn't know the extent of the injury because it had swollen up I mean, and then this Mrs. Braun came up." He signed a retainer, but he did not know the name of the lawyer, and later found out his name was Harry E. Kreindler. He testified he had not known Mrs. Braun before nor had he seen her around the neighborhood. On cross-examination he was asked: " Q. What conversation did you have with Mrs. Braun when she first spoke to you about the case? A. Well, she came up; she said, ' I understand you were hurt in an accident. Have you seen a lawyer?' I said, ' No, I haven't as yet.' "

Nowhere in Heime's testimony is there any thing to show that he requested Mrs. Braun to call. If any excuse for her call is to be found it must be in his apparent acquiescence in the suggestion of the neighbor that she was going to send somebody up to see him about a lawyer.

Fannie Palizzolo testified she was injured by having a window she was opening fall back on her arm. Mrs. Braun called and secured a retainer for respondent. The following is an extract from her testimony: " Q. Did she [Mrs. Braun] tell you how she happened to come to see you? A. She did not explain to me how it was that she came to see me but when I asked her how it was that

she had come to my house, she said, ' Ah, I saw you before, I know you.' She said further that she had a store in the vicinity, that she had occasion to see me."

Catharina Bottoncini testified she was injured by having the ceiling fall on her in the kitchen of her apartment at 233 East Seventy-third street. Mrs. Braun called on her. Then: " Q. What did she tell you? A. She told me that she had been sent to my house by a common acquaintance and that she had found out about the accident that had happened to me, and that is why she had come. Q. Did she ask you to sign a paper hiring the lawyer? A. She asked me first whether or not I wanted a lawyer. I said yes. And I signed a paper."

Mrs. Braun's testimony is that Mrs. Ventura took her to see both Mrs. Palizzolo and Mrs. Bottoncini. Respondent testified that Mrs. Ventura was a client of his previous to the time he was retained by Mrs. Palizzolo and Mrs. Bottoncini. Mrs. Ventura is a sister of both Fannie Palizzolo and Catharina Bottoncini. It is urged " That the probability of Mrs. Ventura having recommended the respondent is great. That Theresa Braun should have solicited both these sisters of Mrs. Ventura without the intervention of Mrs Ventura is extremely improbable and unlikely." Mrs. Palizzolo's testimony is that Mrs. Ventura never spoke to her about Mrs. Braun or respondent. And Mrs. Bottoncini testified that Mrs. Ventura did not speak about Mrs. Braun until after she had signed the retainer. She said: " After the paper was signed I saw Mrs. Ventura and I told her about such a woman come to my house and I signed the paper for her. She said, ' I know her.' "

Frank Spanno testified that he was injured by being struck by a truck and had been endeavoring for a month to settle his own case. Then Mrs. Braun, whom he had never seen nor heard of before, appeared. His testimony is: " But at the same time she was in the house that night, I had the accident about a month before, before I saw this woman, and I always tried to settle this case, and I wrote him a couple of postal cards and they didn't answer me back, but one night happened this woman to be in the house there, I don't know she was looking for somebody and at the same time she came in the house and I was eating supper and she was talking about that lawyer and that lawyer, and I says, ' Gee, I had an accident,' and she said, ' I will give you a good lawyer.' I says, ' I don't care, I only want to go to one lawyer.' She said, ' all right ' and she took my name and address and everything and I gave him the case."

The testimony of Spanno's sister-in-law, Mrs. Weill, would indicate that she was instrumental in having Mrs. Braun call on Spanno.

But Spanno himself did not know whether or not his sister-in-law had spoken to Mrs. Braun.

Testimony of Charles Bory given before Mr. Justice WASSERVOGEL in the investigation conducted before him was read into the record herein. Bory had a son who had been injured in an accident. Mrs. Braun came to see Bory's wife. He testified he did not know Mrs. Braun. His testimony is illuminating as to Mrs. Braun's efforts. An extract therefrom is as follows: " Q. Was the case of your boy given to Mrs. Braun for a lawyer? A. She was fighting it over with my wife; my wife doesn't want to give it to her, and she was going there about three or four times and fighting with her to give her the case, see." The case was finally given to Mrs. Braun, who testified that while she did not know Mr. Bory she had met Mrs. Bory through Mrs. Tehel, who telephoned respondent's office concerning the accident.

Testimony by Edward J. Weinbrunner and James Dragan, his half-brother, indicates that they were solicited by Mrs. Braun. The referee saw fit to hold the Weinbrunner testimony unworthy of belief and the Dragan testimony influenced by Weinbrunner, because their testimony in reference to the checks given them in settlement of their claims was proven to be false.

Mrs. Ida Berkman testified she met Mrs. Braun at the time she was injured. Her testimony is: " I don't remember exactly; it was either the same day or some short time after the accident. I was in my mother's house and she was in a neighbor's house, and this neighbor got her in, see; she heard I had an accident, and Mrs. Braun came in through this neighbor, and she asked about it; I had no lawyer or anything, and told her; she asked me if I was going to give it over to my lawyer, she asked me if I had; ' no,' I said, ' no.' She told me she knew of a lawyer, would I want to give it over. I said yes. So she told me she would attend to it for me, she would have the case given over to him for me." Mrs. Berkman is positive she did not ask her neighbor to recommend a lawyer, as the neighbor's testimony would indicate.

It is admitted that Mrs. Braun recommended cases to respondent, and, in fact, he expected her to recommend cases to him. The duty rested upon respondent to see that such recommendation did not come as the result of improper tactics. Had he extended his inquiry before deciding to take the cases recommended by his investigator he could have ascertained how he happened to be recommended. Respondent's testimony is that the fees collected in all cases recommended by Mrs. Braun amounted to less than the salary she received; that she devoted much more time to cases she had nothing to do with in the way of recommending than she

did with cases she brought in. It may well be that Mrs. Braun's duties were primarily those of an investigator, but, with her, investigation easily led to solicitation.

Sufficient has been shown to establish that Mrs. Braun was actively soliciting retainers which respondent accepted and benefited by.

As respondent has been shown to have profited by the operations of only this one investigator and no financial irregularity is shown, we think that a censure will be sufficient punishment for his offense.

MERRELL, FINCH, McAVOY and PROSKAUER, JJ., concur.

Respondent censured.