■ In the Matter of CARMI RAPPORT and CARL G. WHITBECK, JR., Attorneys and Counselors-at-Law, Respondents. COMMITTEE ON PROFESSIONAL STANDARDS, THIRD JUDICIAL DEPARTMENT, Petitioner.—Per Curiam. Respondents are partners in a law firm with its main office located in the City of Hudson in Columbia County. Respondent Rapport was admitted to practice by this Court in 1958; respondent Whitbeck was admitted by this Court in 1975.

Petitioner, the Committee on Professional Standards, accuses respondents of having engaged in improper client solicitation. After a hearing, the Referee sustained the charge but dismissed the last of five supporting specifications.

Petitioner moves to confirm the Referee's report while respondents have submitted an affidavit in opposition urging rejection of the report and dismissal of the petition.

In 1990, through discussions with one Laurie Pace, the daughter of a client of their firm, respondents learned about L-Tryptophan poisoning and that sufferers thereof were seeking legal representation. As noted by the Referee, L-Tryptophan is an over-the-counter food supplement taken for a variety of disorders. It occurs naturally, but is also manufactured by a small number of companies in Japan. In about 1988, a batch of this normally benign product apparently was contaminated in the manufacturing process and, as a result, several hundred people in the United States became ill in varying degrees of severity. Pace suffered from the poisoning and became the leader of a local L-Tryptophan poisoning support group.

In July 1990, respondents' law form retained Pace as a consultant on L-Tryptophan poisoning matters. She was also expected to recommend the firm to potential L-Tryptophan clients but her remuneration by the firm was not explicitly tied to such referrals. At the time, the firm had no L-Tryptophan clients and no expectation of being retained by L-Tryptophan poisoning victims, absent Pace's efforts.

Over the next few months, Pace did compile a wealth of material on L-Tryptophan poisoning for the firm. More significantly, 14 prospective clients approached the firm because of Pace's recommendations and ten signed retainer letters with the firm.

Pace's consultancy was only loosely supervised, if at all. She worked out of her home and submitted vouchers for payment which were only cursorily reviewed. Her compensation quickly began to approach the $25,000 annual maximum set forth in the July 1990 agreement and her demands for more money became unrelenting.

Respondent Rapport's growing unease over the financial and ethical questions surrounding the firm's relationship with Pace finally led to a discussion with ethics professors in New York City in early October 1990, a meeting with Pace, and a letter to Pace terminating the relationship on October 19. The firm also sent letters to its L-Tryptophan poisoning clients advising them that the firm would no longer be able to represent them.

The termination of the consultancy resulted in a financial loss to the firm of about $22,000, including the $17,000 plus paid to Pace and expenditures for trips by firm attorneys to Boston to discuss L-Tryptophan poisoning with doctors and to Colorado to meet with an L-Tryptophan subgroup of the American Trial Lawyers Association. In addition, the firm never commenced any L-Tryptophan litigation. Finally, Pace's father discontinued his relationship with the firm.

The possibility that Pace might approach petitioner with a complaint about the soured relationship prompted respondent Rapport to voluntarily approach petitioner first. He met with the chief attorney in November 1990 and provided petitioner with a letter narrative of the relationship in January 1991. Petitioner's subsequent investigation and examinations under oath of respondents and several other firm attorneys led to the instant petition.

The single charge of the petition accuses respondents of violating Code of Professional Responsibility DR 1-102 (A) (5)

and DR 2-103 (A), (B) and (C) (22 NYCRR 1200.3 [a] [5]; 1200.8 [a], [b], [c]) and Judiciary Law § 482 by soliciting employment from persons who had not sought legal advice; compensating a person to recommend or obtain employment by a client; rewarding said individual for making a recommendation resulting in employment by a client; and requesting a person to recommend or promote the use of respondents' services.

We confirm the Referee's report sustaining the charge of improper solicitation.

Respondents argue that petitioner has failed to meet its burden of proof because no direct evidence of improper solicitation was offered, for example, by evidence of written agreement or through testimony by Pace or solicited clients, and because respondents testified that solicitation was not a condition or requirement of Pace's employment. However, we conclude that the charge of solicitation is sufficiently supported by proof of the circumstances and the inferences derived therefrom surrounding and undergirding the Pace relationship (see, e.g., Matter of Fisch, 269 App Div 74; Matter of Murphy, 254 App Div 770; Matter of Bluhm, 254 App Div 566). Also, respondents' denials are not dispositive (see, e.g., Matter of Von Wiegen, 146 AD2d 901, 903, lv denied 74 NY2d 603).

Respondents also argue that an inference of improper solicitation should not be made from the firm's arrangement with Pace because the arrangement did not implicate the evils the curtailments on solicitation supposedly combat. Those evils have been variously described as stirring up litigation, inappropriate pressures on the solicited individuals (including undue influence, intimidation, and overreaching), presentation of biased information to the potential client (including one-sided presentations and information clouded by the pecuniary self-interest of the solicitor), vexatious conduct, a demoralizing effect on the profession of law, and an unseemly rivalry among attorneys in seeking clients (see, e.g., Matter of Clark, 184 NY 222, 233; Matter of von Wiegen, 101 AD2d 627, 628, mod 63 NY2d 163, cert denied sub nom. Committee on Professional Stds. v Von Wiegen 472 US 1007; Matter of Gondelman, 225 App Div 462, 466; Matter of Rothbard, 225 App Div 266, 268; Roth, Confronting Solicitation of Mass Disaster Victims, 2 Geo J Legal Ethics 967, 978-979). We reject respondents' argument. Pace's status with her support group may have provided her attorney recommendations a particular cachet and may have made them difficult for the victims to reject. Also, because her employment depended on the firm retaining victims as clients and because her workload and therefore

compensation as a consultant would increase as the firm's L-Tryptophan poisoning clientele increased, the information she provided to victims was likely to be biased. Also, in general, hiring the leaders of victim support groups to, among other things, effect client referrals, appears unseemly and could lead to bidding wars among firms.

Finally, respondents argue that their arrangement with Pace was ethical because it involved proper referrals as opposed to improper solicitation and they analogize it to a firm which hires the son of a bank president with the fortuitous but not unexpected result that bank clientele begin to retain the firm in greater numbers. We also reject this argument. While it is, of course, permissible for an attorney to accept a client retainer which results from a fortuitous referral by another, such a referral usually occurs when the potential client makes the initial contact. Here, the firm initiated the contact by insinuating itself into the support group in the person of Pace *(see generally, Matter of Kreisel,* 21 AD2d 431, 433; *Matter of Kreindler,* 228 App Div 492). But for this active seeking out of clients through in-person contacts, respondents' firm would not have been approached by any of the victims of L-Tryptophan poisoning that retained it *(see generally, Matter of Marino,* 29 AD2d 652, *appeal dismissed* 21 NY2d 879; *Matter of Seligsohn,* 227 App Div 480).

In confirming the Referee's report, we also note that an attorney can be charged with implied knowledge of the acts of an agent such as Pace *(see, e.g., Matter of Rothbard, supra; cf., Matter of O'Neill,* 228 App Div 518); that improper solicitation may be found even though the potential client actually wanted and needed a lawyer *(see, Matter of Entes,* 39 AD2d 182); and that improper solicitation may be deemed conduct prejudicial to the administration of justice *(Matter of Newell,* 174 App Div 94, 98).

In determining an appropriate disciplinary sanction, we note several mitigating factors. First, violation of the prohibitions against solicitation involves rules more prescribing matters of good taste and etiquette rather than moral matters *(see, Matter of Schwarz,* 231 NY 642; *Matter of Koffler,* 70 AD2d 252, 264, *revd on other grounds sub nom. Joint Bar Assn. Grievance Comm. v Koffler* 51 NY2d 140, *cert denied* 450 US 1026). Indeed, the value of the prohibitions is increasingly criticized by courts and commentators *(see,* Hill, *A Lawyer's Pecuniary Gain: The Enigma of Impermissible Solicitation,* 5 Geo J Legal Ethics 393; *see also, Matter of Kressner,* 108 AD2d 334, *appeal dismissed* 65 NY2d 999). Second, respondents have

otherwise unblemished disciplinary records and enjoy excellent professional reputations. Their firm was recently presented with the small firm *pro bono* award by the New York State Bar Association and respondent Rapport has served as chairman of his local county grievance committee. Third, respondents voluntarily ceased the improper arrangement with Pace and, significantly, they voluntarily brought the matter to petitioner's attention. Fourth, there is no evidence that the misconduct prejudiced any of the clients who retained them. Finally, we conclude that petitioner's proof does not support some of the more aggravating circumstances set forth in the petition specifications. For example, we do not find that the firm initially agreed to pay Pace $11,000 per retained client, that respondents bought a car for Pace, or that Pace actually threatened to lodge a disciplinary complaint at or about the time of her employment termination.

In view of the above we conclude that respondents should be censured for their professional misconduct.

Mikoll, J. P., Yesawich Jr., Mercure, Mahoney and Casey, JJ., concur. Ordered that petitioner's motion to confirm the Referee's report is hereby granted and respondent's motion to disaffirm the Referee's report and dismiss the petition is hereby denied; respondents are hereby found guilty of the professional misconduct charged and specified in the petition except that insofar as the specifications charge that the firm initially agreed to pay Pace $11,000 per retained client, that respondents bought a car for Pace, and that Pace actually threatened to lodge a disciplinary complaint, said specifications are hereby dismissed; and it is further ordered that respondents be and hereby are censured.