In the Matter of ARTHUR J. LEVINE, an Attorney, Respondent.

First Department, July 2, 1924:

**Attorney and client — disciplinary proceedings — attorney censured for soliciting clients in accident cases.**

An attorney charged with professional misconduct, in that he has been extensively engaged in the solicitation of accident cases and maintained clerks or investigators who were not lawyers to do the soliciting, censured merely, since it appears that out of approximately one thousand cases there was evidence in only two cases of clients having been solicited by the employees of the attorney and there is no proof of the attorney's connection with any fraudulent, manufactured or dubious case.

DISCIPLINARY proceedings instituted by the Association of the Bar of the City of New York.

*Einar Chrystie*, for the petitioner.

*Wellman, Smyth & Scofield* [*Herbert C. Smyth*, of counsel; *Roderic Wellman* and *Harold R. Medina* with him on the brief], for the respondent.

DOWLING, J.:

The respondent was admitted to practice as an attorney and counselor at law in the State of New York in October, 1908,

at a term of the Appellate Division, Supreme Court, First Department. .

He is charged with a violation of his duties in his professional capacity in two specifications:

" (a) That for some time past the respondent has been extensively engaged in the solicitation of accident cases and has paid and employed various persons, not members of the Bar of the State of New York, who with his knowledge and approval and in consideration of the salaries received by them from him, have solicited and procured many retainers for the respondent from persons who claimed that they had been injured in accidents.

"(b) That the respondent has promised and given divers persons, not members of the Bar of the State of New York, valuable considerations for placing in his hands or for causing to be placed in his hands, the claims or demands of persons injured in accidents for the purpose of bringing actions thereon or for the purpose of having the respondent represent the claimants in the pursuit of their civil remedies for the recovery of their claims."

The learned official referee has reported that he finds the respondent " not guilty " on each charge. As to the first charge he finds that

" In the years 1920 and 1921 he handled between three and four hundred cases in the Counties of New York, Kings and Bronx.

" Of these, testimony as to the means and methods employed by respondent to procure retainers was given in twenty-nine cases. In twenty-five of them respondent was recommended to the injured person or the family by friends or acquaintances as a suitable lawyer to handle the case. In each of those cases respondent or his office was communicated with and in response thereto one of his clerks or employees was sent, who procured a written retainer. In two cases the testimony was not clear as to the means by which the retainer was procured and in the remaining two cases (Lyons and Hall) the retainers were procured by the direct solicitation of an employee of respondent.

" Disregarding impressions produced by the general tendency of the testimony and confining consideration to the concrete cases of unethical conduct of which proof has been given, there have been but two of such cases directly chargeable to the respondent. While the respondent is justly chargeable with unethical conduct in these two cases, the evidence on the whole is in my opinion insufficient proof of his being " extensively engaged in the solicitation of accident cases,' and I therefore find him not guilty."

As to the second charge the referee states:

" On the second specification, I am of the opinion that it is

not within my province to formally declare respondent guilty or not since it is conjoined to and dependent upon the first specification, and the finding upon that may be held to be determinative of the whole.

" Nevertheless in conformity with what I believe to be my duty to the Court, I submit a brief resume of the testimony relative thereto

" Respondent maintains a staff of five young men in connection with his office and business, designated clerks and investigators. They are paid in varying sums from fifty to eighty dollars a week and are not lawyers or law students. Their duties and occupations are to respond to notifications of the happening of accidents and to proceed to the homes of the injured persons or to the hospitals or other places where such persons may have been taken, and procure a retainer of the respondent to institute actions for the recovery of damages because of the injuries to the persons. Each of the clerks or investigators is provided with printed blank forms of retainer, which also provide for the percentage of recovery of damages to be accorded to the attorney and the assumption by him of necessary expenses in the action."

As to the last clause in the final sentence, the learned referee is apparently in error. No such provision appears in the printed forms prepared by respondent as offered in evidence, which assign the costs to respondent and agree to pay him fifty per cent of any sum recovered by way of settlement, verdict or otherwise; no charge to be made for services unless a recovery be had.

The record discloses the following facts: During the years 1920 and 1921 the respondent was retained in behalf of the claimants in about four hundred accident cases. In practically all of these cases the retainers were obtained by some one of the five men employed by the respondent, above referred to. They averaged between thirty-five and forty-five cases per man each year. The names of these employees are Fredericks, Waters, Nacy, Mosher and Perrone. Not one of these employees ever attended a law school and not one of them has ever been admitted to the bar. While in respondent's employ they were called law clerks and investigators. Mosher was about thirty years of age and received a weekly salary of eighty dollars. Fredericks was about thirty-three years of age and received a weekly salary of sixty dollars. Nacy was about twenty-nine years of age and received a weekly salary of sixty dollars. Perrone was about thirty years of age and received a weekly salary of sixty dollars. Waters was about thirty-two years of age and received a weekly salary of fifty dollars. The respondent admitted when he appeared before the petitioner's

committee on grievances that he had sent Fredericks many times to interview prospective clients; that when calls are received at his office they are " assigned to one of the men and they go and see the injured party and see whether there is anything to it." He was unable to average the number of calls a day. Fredericks, Nacy, Perrone and Waters used automobiles in the course of their employment. When they went to call upon prospective clients they carried with them the above referred to printed forms of retainer providing for a contingent fee of fifty per cent of any amount subsequently recovered. When they went to call upon the parents or guardians of injured infants, they carried with them, in addition to the printed proposed retainers, blank applications for the appointment of guardians *ad litem*. When they went to call upon the relatives of persons who had been killed in an accident, they carried with them, in addition to the printed proposed retainers, blank applications for the appointment of administrators. The respondent had form letters prepared by a mimeograph process, in which the name of the client was inserted in typewriting, and which were sent out after retainers had been signed, to his clients, giving suggestions as to what they should do in the way of refraining from talking about their cases, or signing any papers, if a representative of the defendant in their action should call upon them.

The respondent claims that the charges against him are the result of the activities of an organization known as " The Alliance for the Prevention of Accident Fraud," composed of corporations interested in defeating actions to recover damages for torts.

At the outset it may be said that there is absolutely no proof of respondent's connection with any fraudulent, manufactured or dubious case.

Further, in the large volume of business conducted by him numbering nearly one thousand cases, which were the subject of investigation by the Alliance prior to the bringing of these charges, only twenty-nine cases actually were involved in the hearing before the referee. In twenty-five of these cases the testimony satisfactorily established that there had been no solicitation or procurement by the respondent or any of his employees, but that, on the contrary, the respondent's name had been suggested by some entirely disinterested person, and the relation of attorney and client entered into at the direct request and solicitation of the injured person himself. In two of the remaining cases, the witnesses produced had such a confused recollection of the matter as to be of no significance one way or another. In only two out of all of the cases (Lyons and Hall) was there direct proof estab-

lishing that the retainers of respondent were obtained by the direct solicitation of respondent's employee. Such a small percentage of violation of the ethical duties of respondent by his employees might be charged to overzealousness or mistake upon their part. The employee who procured both these retainers was not called as a witness by respondent.

The learned referee was right in finding that the respondent had not been " extensively " engaged in the solicitation of accident cases, since two cases were all that were proved to have been so solicited. But none the less he was equipped with a specialized office force which would give the impression that he was so engaged. He employed a force of clerks and investigators devoting their time and attention solely to accident cases, and paid them salaries commensurate with active work. None of them was a lawyer or had studied law. Theirs was the business and administrative, as distinguished from the legal, side of litigation, including the obtaining of evidence for the trial. If they were individually engaged in soliciting and drumming up business for respondent in return for their salaries, they were violating section 270 of the Penal Law. If respondent employed them in reality as agents or runners for the purpose of going out and seeking those with personal injuries claims to secure them as clients for himself, he was violating the 28th Canon of Ethics adopted by the American Bar Association. There are many suspicious circumstances about the way in which this branch of respondent's business was conducted, including the use of standardized forms, printed or mimeographed, for the details of the business, not usual or deemed necessary in an ordinary law office. If the respondent has brought doubt upon his professional methods, he is responsible for it, even though the outcome has not established that the doubt was entirely justified.

While we agree that respondent has not been proven guilty of the extensive improper practices with which he was charged, on the other hand we feel that the referee was justified in finding him guilty of unethical conduct in the Lyons and Hall cases, upon the record, the testimony on which it is not necessary to here spread forth at length.

While an attorney has the undoubted right to conduct his business in such way as he sees fit, consistent with his scrupulous observance of law and of the ethics of his profession, if he maintains such a specialized force as respondent maintained here for the conduct of the accident branch of his professional activities, he must expect to be held responsible for the irregularities or violation of law or ethical standards which follow as a result thereof. The

abuses and risks which follow the wake of the general system of indiscriminate solicitation of accident claims have repeatedly been called to the attention of the profession. In *Matter of Clark* (184 N. Y. 222) Judge BARTLETT said: " It is not necessary for the protection of the poor to sanction the practice which, as applied to negligence cases under the name of ' ambulance chasing ' has brought deserved discredit upon those engaged in it; and in any event, if the views which have been expressed are correct, the law denounces the practice as criminal."

In *Matter of Maires's Disbarment* (189 Penn. St. 99), affirming the opinion of the lower court, therein cited, it was said (p. 108): " The manner of obtaining the right to bring these suits involves another common-law offense, that of common barratry. Persons who did not care to bring suit, and perhaps thought their injuries were as much the result of their own carelessness as that of any one else, or were unwilling to invest their money in the moderate costs of a lawsuit, were hunted up by the assistants or students, office boys, or ' runners ' of Maires, as these pests are called, and thus litigation was made and dishonesty ensued in the division of the spoils."

And again (at p. 109): " The cases brought to our attention have given positive proof of that which is frequently heard in ordinary conversation, that there are lawyers who make it a business to hunt up litigation, take cases upon speculation, and pay the costs, with the usual result — quarrels with their clients based upon a dishonest and unfair division of the moneys recovered. No lawyer with a proper sense of the dignity of the profession, as well as his own self-respect as a man, will stoop to such practices as have been laid bare in the present proceeding. Not even death can keep these ghouls of society at bay; their emissaries invade the house of mourning; they enter the hospital; no place is sacred from their intrusion. If any more such exist, it is hoped that the censors of the Law Association will continue their laudable efforts, until the offenders shall have been discovered and driven out of the profession.

" The assistant or runner who hunts up these cases is a nuisance which should be abated. He participates in the spoils, his share being covered up in the items for investigating, working up cases, and doing detective work."

As was said in *Ingersoll* v. *Coal Co.* (117 Tenn. 311): " We cannot, we dare not, lower the standard of the legal profession to that of a mere business, in which fleetness of foot, or the celerity of the automobile, determines who shall be employed."

In *Matter of Newell* (174 App. Div. 94) the court said: " Unless

the members of our profession are prepared to abandon the traditions which have entitled it to be regarded as an honorable calling, unless we are prepared to yield to the notion that the members of our profession have our sanction to prey upon society, we should not hesitate to condemn the practices proven against the respondent in this case."

All this involves no limitation whatever upon the freedom of action of the attorney who honestly and earnestly seeks to employ the best ability possible in his office, and to arrange his office force in the way he deems best suited to get proper results for the clients who come to him with their business in the usual and proper way. Nor does it involve any interference whatever with the right of attorneys to conduct their affairs as they deem best, always in conformity with law and the ethics of their profession.

But had the proof in this case justified the finding that respondent maintained a special bureau in his office, the employees wherein, however designated, were engaged solely and entirely in the indiscriminate solicitation of accident claims from parties previously unknown to them or to their employer, and that the whole department wherein they were engaged was so equipped with blank forms of all kinds as to show the employer's purpose to make a commercialized venture of this branch of his professional activities, we should feel that a case was made out requiring disbarment, even though the agents were paid salaries instead of a percentage of the amounts ultimately received by their employer.

The practice of the profession of the law should not be allowed to degenerate into a vulgar scramble for clients, in which the advantage will always be with the most unscrupulous. Nor can practices be permitted to continue which would degrade the profession in the eyes of the public and render its efforts to establish and maintain high ethical standards absurd or meaningless.

While the case made out by petitioner does not bring respondent's practices within those condemned, I am of the opinion that for the two specific cases in which the referee has found him guilty of unethical conduct he should receive the censure of this court. In other respects, the report of the referee is confirmed.

Smith, Merrell, McAvoy and Martin, JJ., concur.

Respondent censured. Settle order on notice.