## In re McCULLOUGH.

No. 6101.   Decided November 2, 1939.   (95 P. 2d 13).

534

*Elias Hansen,* of Salt Lake City, for R. Verne McCullough.

*E. A. Rogers, E. C. Jensen,* and *L. O. Thomas,* all of Salt Lake City, for Utah State Bar.

McDONOUGH, Justice.

This is a review, pursuant to Section 6-0-15, R. S. U. 1933, of a recommendation of suspension of the plaintiff for two years from the practice of law in Utah, made pursuant to Section 6-0-17, R. S. U. 1933.

A Prosecuting Committee of the Utah State Bar filed a complaint before a Disciplinary Committee of the Utah State Bar, charging the plaintiff with unprofessional con-

duct in thirteen particulars. After the taking of voluminous testimony and the reception of numerous exhibits, the Disciplinary Committee found five of the charges sustained by the evidence. This committee recommended suspension of the plaintiff from the practice of law in all courts of the State for two years and until he satisfies the bar "that he is a fit and proper person, both morally and in the knowledge of law, to be reinstated" and that he pay costs.

These findings and recommendations were reviewed by the Board of Commissioners of the Utah State Bar which concluded that all of the charges found sustained by the Disciplinary Committee were sustained and also found that one charge not found sustained by the committee was sustained, and made the same recommendation as the committee.

. Attorneys for the Utah State Bar, in their brief, have urged that charges were sustained by the evidence in addition to those found sustained by the Disciplinary Committee and the Board of Commissioners. This court may review the entire record or it may conduct its own inquiry and it is not limited to the consideration of evidence relating to the charges found sustained by the Board or the Committee. Section 6-0-18, R. S. U. 1933; *In re Oliver,* 97 Utah 1, 89 P. 2d 229; *In re Barclay,* 82 Utah 288, 291, 24 P. 2d 302; *In re Hanson,* 48 Utah 163, 166, 158 P. 778; *In re Evans et al.,* 42 Utah 282, 300, 130 P. 217. But the plaintiff has a right to a review of the charges found against him, and the additional inquiry within or without the record as made is within the discretion of the court.

The standard or quantum of proof which should govern this court in such a review was stated in *Re Hanson,* supra, at page 167 of 48 Utah, at page 779 of 158 P. to be:

"* * * 'the charges should be clearly sustained by convincing proof and a fair preponderance of the evidence.' * * * the evidence should be clear and convincing * * *."

And in *Re Evans & Rogers,* 22 Utah 366, 387, 62 P. 913, 919, 53 L. R. A. 952, 83 Am. St. Rep. 794: ■

"The summary proceeding of disbarment is civil, and not criminal. 6 Enc. Pl. & Prac. 709; *Matter of Randel,* 158 N. Y. [216] 219, 52 N. E. 1106; *State* v. *Clarke,* 46 Iowa 155. In that proceeding, however, more than a preponderance of the evidence is required. The guilt of the attorney must be clearly established."

The unprofessional conduct with which the plaintiff was charged may be classified generally as (1) solicitation of employment in personal injury cases through one Sid Spencer—charges (a), (c), (d), (e), (f), (g), (h), (j); (2) solicitation directly of employment in personal injury cases —charges (b) and (g); (3) attempt to procure false testimony in a personal injury case—charge (i); (4) advising an accused person released to the plaintiff to leave the state —charge (k); (5) refusing to disclose to a court the whereabouts of an accused person released to plaintiff's custody —charge (1); and (6) giving false testimony under oath in a contempt proceedings—charge (m). Of these, (3) and (4) were found not sustained, but one or more charges under each of the other heads were found sustained.

Soliciting employment through one Sid Spencer was held sustained as to three charges—charges (d), (e), (f). It must first be ascertained whether there were acts of solicitation by Spencer; and if there were, then whether they were at the direction or with the consent or acquiescence of the plaintiff McCullough.

Solicitation of Mr. and Mrs. Wunderli by Sid Spencer was charged as follows—charge (d):

"That on or about the 11th day of January, 1934 one Fritz Wunderli, together with his wife, Blanche Wunderli, were riding in an automobile which was struck by a Union Pacific Motor Car train. That on the morning following the said accident one Sid Spencer, who was then known to the said R. Verne McCullough to be engaged in the business of soliciting employment on behalf of the said R. Verne McCullough from personal injury claimants, came to the home of

the said Mr. and Mrs. Wunderli in Salt Lake City, Utah and interviewed the said Mr. and Mrs. Wunderli and solicited them to employ the said R. Verne McCullough as their attorney to represent them to prosecute, collect, settle or compromise any claims which they might have for personal injuries. That the said Mr. and Mrs. Wunderli did not employ the said R. Verne McCullough to represent them."

Mrs. Wunderli testified that on the afternoon of January 11, 1934, while driving in an automobile with her husband, their car was struck by a Union Pacific Motor Car train; that she was injured and was taken to the emergency hospital, thence home; that the next morning about 9:00 or 9:30 o'clock a man came to the door who introduced himself as Sid Spencer and said he was with Attorney McCullough; that he gave them a card of the United Claims Adjustment Bureau located at 734 Judge Building, Office Phone Was. 6673 (which were McCullough's room and phone number); that he said he would like to take her case; that he called on the telephone the next day and asked about the case—about "letting us handle your case"; that he was rather tall, of medium complexion, with a fair skin, between thirty and thirty five years of age. This testimony is supported by an affidavit of Mrs. Wunderli dated January 23, 1934, which she used to refresh her recollection prior to taking the stand.

Mr. Wunderli's testimony was substantially the same. He identified prosecution's Exhibit "C" as being similar to the card handed them at their door by a man calling himself Sid Spencer and saying he was with McCullough and that he would like to take their case. His recollection was that the man was taller than himself and younger. On cross-examination he also testified that a few months prior to the hearing he told McCullough that the man who called at their house lived in Highland Park; but that he had since refreshed his recollection by reading the affidavit he signed in January, 1934. This case was settled, without suit, by a claims agent for the railroad who prepared the affidavits which Mr. and Mrs. Wunderli signed.

This testimony establishes the identity of their caller as one Sid Spencer, that he solicited their case, and that he stated he was acting for McCullough. Whether this is chargeable to McCullough will be later considered.

It was similarly charged—charge (e)—that the plaintiff, through Sid Spencer, solicited W. T. Woodland and obtained his signature to a contract of employment under which Woodland later refused to proceed.

Mr. Woodland testified that he was injured in an automobile accident on October 23, 1933. He was taken to the emergency hospital, then home for part of one day, then to a hospital for three or four weeks. While at home and in bed on the day following the accident a man called with reference thereto and gave his name as Spencer and mentioned the name of McCullough and another lawyer. Spencer had him sign a paper relating to a suit for the injury, stating "that he could get more out of it for me that way than I could get by settling with them direct." He was there "representing" or "in the interests of" McCullough. Spencer was tall, young and dark complexioned.

Mrs. Woodland testified that the paper which her husband signed, and which related to a lawsuit, had "S.—Spencer" at the bottom. She could not recall the middle initial. It provided that if they got nothing they didn't have to pay anything. The paper did not contain the name of McCullough at all. About an hour after Spencer left an attorney with offices in the Kearns Building, which as indicated herein above was not the building in which McCullough had his offices, called and left his card.

This testimony establishes the fact that one Spencer solicited employment in litigation and that McCullough's was one of the two lawyers' names mentioned by him and that he was there in the interest of McCullough. This alone does not connect McCullough with the solicitation.

It was also charged—charge (f)—that McCullough solicited employment of one Clarence York through Sid Spencer and that York signed a contract to let McCullough rep-

resent him on the basis of which McCullough made a settlement and paid York $100 with McCullough's check.

Clarence York testified as follows: That in October, 1931, he drove an automobile containing also Shirley Erickson, Oren Swenson, Naomi Gooen, and Louise Christensen into a D. & R. G. train in Midvale, Utah, injuring Louise Christensen seriously and the others slightly. Sid Spencer called on the witness in Orem five or six days afterwards, saying he represented the law firm of McCullough and Callister and that he would like to handle the case for them. York signed a contract with Spencer tendered, turning the case over to McCullough and Callister for one-third the recovery if settled out of court and fifty per cent if obtained by suit. Shirley Erickson and Oren Swenson also signed the contract at Erickson's house. About a month later they made an appointment with Sid Spencer in Salt Lake City, and he took them to McCullough's office where they met with McCullough and talked about how the accident happened. York later, in Orem, signed a railroad check for $150 in return for which Sid Spencer gave him McCullough's personal check for $100. He signed only one instrument, other than a release at the time he received a check, and that was the contract to employ McCullough. When Sid Spencer first came to Orem, Elmer Christensen (Louise's brother) came with him. He believes Louise Christensen's signature was on the contract he signed. He identified his signature on a statement (Defendant's Exhibit 4) of how the accident happened but couldn't recall the circumstances of its signing.

Oren M. Swenson testified that the accident occurred October 11, 1931, and that a few days thereafter Sid Spencer came to Orem and wanted them to sign a contract to let McCullough handle the case, which they did sign and which was the only instrument they signed, except a release when a check from the railroad was endorsed. He signed no paper in McCullough's office and only one for Sid Spencer. Defendant's Exhibit 7, a statement of the accident and not a

contract signed by the witness and Shirley Erickson, was identified as the instrument he signed for Sid Spencer in Orem. York, the driver, signed a separate statement. The witness, York, Shirley Erickson, and Louise Christensen's father, Soren C. Christensen, discussed the fact that Louise had employed McCullough and that it would be advisable to have one attorney represent them all. This was at a boarding house in Salt Lake prior to Sid Spencer's first trip to Orem. On re-direct the witness admitted signing Exhibit 7, stated that he signed but one paper and that he signed a contract given him by Sid Spencer to employ McCullough.

Soren C. Christensen, father of Louise, stated that the accident occurred Sunday, October 11, 1931; that he arrived at the hospital in Salt Lake City from his home in Moroni, Monday evening; that a Mrs. Michael, a Mrs. Calder, and a Mr. Draper recommended McCullough as an attorney to handle the case, one of them also mentioning an attorney named Hanson; that the next morning Mr. Kinney from the railroad offered him $250 to settle the case; that that afternoon, Tuesday, he went to see McCullough at his office and "practically decided" that he would give him the case, subject to speaking to the girl; that one or two days thereafter Mr. Spencer introduced himself at the hospital and explained that he investigated cases for Mr. McCullough; that he next saw Spencer at McCullough's office on his second visit there, this time in company with his son and at this time he signed McCullough's contract; that McCullough thereafter had witness's daughter sign the contract; that Wednesday or Thursday evening the three boys Clarence York, Shirley Erickson, and Oren Swenson, came to Mrs. Michael's place where they discussed attorneys and he "told the boys that we had decided to engage Mr. McCullough as our attorney, and the boys told me that they intended to support the girl by all means, and, inasmuch as we had engaged Mr. McCullough, they felt like they would engage him for their part of the affair"; that on Friday Mr.

Spencer and Elmo Christensen went to Orem to interview the boys as witnesses.

Louise Christensen testified that she was in the hospital for one week; that on Tuesday or Wednesday her father mentioned the name of Attorney McCullough, and she told him to take care of it; that she signed a contract employing McCullough while in the hospital but did not know who handed it to her; that after being moved to Mrs. Michael's place on Sunday following the accident she met Mr. Spencer for the first time and about two weeks later he came with the typewritten statements of the boys in the accident and took her version.

Shirley Erickson testified that he and the other two boys talked to Mr. Christensen at Mrs. Michael's house about this employment of McCullough and they all said they thought they should stick together in employing an attorney; that a few days thereafter Mr. Sid Spencer came to Orem with Elmo Christensen and talked to the three boys at Erickson's house about the accident and had them sign the notes he made as their version of the accident; that about Christmas time the three boys went to McCullough's office where certainly Erickson and Swenson and probably York signed typewritten statements of the accident and agreed orally that McCullough should take their cases on the same basis as Louise's.

This testimony on this charge falls short of the clear and convincing proof necessary in this type of case to show solicitation of employment. From this testimony it appears that McCullough was employed by Louise Christensen on recommendation to her father by third parties and that the boys felt they should employ counsel for her sake and that Spencer's contact with them was investigative. But after their indication of desire to employ common counsel, even if Spencer had contacted them for McCullough with reference to the terms of employment, it would not constitute solicitation of a type which, standing alone, would in our opinion justify sus-

pension. But this testimony does tend to throw light on the intimacy of the relations between McCullough and Spencer. Spencer visited the injured and convalescing client; he made appointments with witnesses and prospective clients; and he took checks to the witnesses, procuring their endorsements and signatures on releases for the railroad, all in addition to his work of investigating accidents and interviewing witnesses.

Are any of the acts of solicitation by Sid Spencer herein shown chargeable to the plaintiff? The employment by an attorney of an investigator in personal injury cases is of course not unethical, and it cannot be inferred from such employment alone that the attorney is engaged in "ambulance chasing". If the plaintiff regularly employed Spencer to investigate his cases after he had been employed as counsel, there would be nothing unethical in the arrangement. Further, Sid Spencer can lawfully operate an investigation business and attempt to cover accidents on his own account so as to have evidence which he can make available to a lawyer who is subsequently retained and who contacts Spencer. But if Spencer attempted to cover accidents regardless of employment of counsel and solicited the cases in behalf of McCullough or anyone else, and this were done with the knowledge and acquiescence of McCullough or such other lawyer, that would be such solicitation by the attorney through Spencer as to amount to unprofessional conduct. *McCue* v. *State Bar of California*, 4 Cal. 2d 79, 47 P. 2d 268; *Fish* v. *State Bar of California*, 214 Cal. 215, 4 P. 2d 937; *Chreste* v. *Commonwealth*, 171 Ky. 77, 186 S. W. 919, Ann. Cas. 1918E, 122; *State* v. *Rubin*, 201 Wis. 30, 229 N. W. 36; *State* v. *Cannon*, 199 Wis. 401, 226 N. W. 385; *In re Katzka*, 225 App. Div. 250, 232 N. Y. S. 575; *In re Rothbard*, 225 App. Div. 266, 232 N. Y. S. 582; *Smith* v. *State Bar*, 211 Cal. 249, 294 P. 1057, 73 A. L. R. 401: Thornton, Attorneys at Law, Sec. 844; 7 C. J. S., Attorney and Client, pages 758, 759, § 23; 5 Am. Jur. 425.

The record discloses no instance where Spencer procured a contract to handle a case which he turned over to McCullough and which the latter handled. Indeed, the record discloses no case where Spencer made the first contact and either took the client to McCullough or took McCullough to the client, unless it be the Erickson case—charge (a). In this case Mrs. Erickson's deposition was taken ex parte after one day's notice and after both the plaintiff and his attorney had filed affidavits that they could not attend, objecting to the short notice. Mr. McCullough handled this case and according to the deposition Spencer called on Mrs. Erickson shortly after her son was injured and without previous acquaintance or call. Mrs. Erickson's neighbor and close friend testified that she and Mrs. Erickson called a Mr. Gorey for recommendation of an attorney and he recommended Mr. McCullough and thereafter Mr. Spencer came. McCullough testified that Mrs. Erickson called him and stated Mr. Gorey had recommended him and he thereafter sent Sid Spencer to investigate. Mr. Gorey testified that Mrs. Erickson called and asked about McCullough and that he recommended him. This testimony falls short of the clear and convincing proof necessary to establish solicitation in such a case as this. The Committee and Board also so found.

It is true that in the Beitel case—charge (h)—the testimony shows that Spencer solicited and got a contract to handle the case as McCullough's representative, and McCullough's partner went to see Mr. Beitel and that he and Spencer collected, after endorsing an insurance check in the firm name. McCullough denied any connection with or knowledge of the case.

The testimony against McCullough on this branch of the case is, then, entirely circumstantial and indirect.

The Board of Commissioners made the following finding with reference to this:

"4. That for several years prior [subsequent] to October, 1931, one Sid Spencer occupied as a subtenant a room in a suite rented by the

defendant, wherein the said defendant and his brother-in-law engaged in the practice of the law under the firm name of McCullough and Callister. That Spencer's name appeared on the outer door of said suite; that he was listed in the telephone directory with the same telephone number as that listed under the firm name of McCullough and Callister; that they all had a common reception room; and that the defendant constantly employed the said Spencer as an investigator in damage suits being prosecuted by the said defendant; that he occasionally did stenographic work for defendant, and was paid various sums of money from time to time by defendant. That a large number of checks were produced by defendant covering payments to Spencer during said time, all of which checks are specifically listed in the transcript of the testimony. That while defendant testified that he had no definite agreement with Spencer as to the basis by which his compensation should be determined and that he paid Spencer what he believed said services were worth in each case, yet he admitted that there was no definite standard set-up for the fixing of said compensation, and that the payment was frequently fixed on a percentage basis, and the Commissioners find from the evidence that Spencer's compensation was fixed and determined upon the basis of the results obtained in the various cases investigated by him and the amount of recovery obtained. The defendant admitted that he knew that it was a common rumor among the Bar, especially in Salt Lake City, that Sid Spencer was considered as a 'runner' or 'solicitor' of business for defendant, but that notwithstanding such rumors, he continued to carry on the same relationship as hereinbefore specifically found. He further stated that he did so because he knew the rumors to be false, and the evidence shows that defendant made little or no effort to investigate the source of said rumors, or to take any steps to correct the impressions which were prevalent because of the relationship which seemed to exist. The Commissioners further find that the said Sid Spencer did solicit injury cases for the defendant and by his solicitations he did try to induce injured persons to sign contracts employing the defendant to act as their attorney, and from all of these facts the Commissioners find that the defendant knew that Sid Spencer was engaged in the solicitation of business for him, and he thereby authorized the said Spencer to make such solicitations and acquiesced in such conduct and accepted the fruits of any business thereby directed to his office through the solicitations and representations of the said Spencer."

This finding, except for the last sentence, reflects generally the testimony on the relationship between Spencer and McCullough. The first sentence should refer to the

several years "subsequent" to October, 1931, and during part of that time McCullough and Callister were not practicing law as a firm. There seems to be no support in the record for the finding that McCullough's payments to Spencer were "frequently fixed on a percentage basis," although it may fairly be said that "Spencer's compensation was fixed and determined upon the basis of the results obtained in the various cases investigated by him and the amount of recovery obtained" if there be added to that statement the element that Spencer's contribution to the recovery was the principal element in determining what his compensation should be. The last sentence of the quoted finding includes inferences that McCullough knew that Spencer was soliciting for him, which must be further examined. There is no evidence in the record that McCullough "accepted the fruits of any business thereby directed to his office through the solicitations and representations of the said Spencer," except in the Clarence York matter which has been considered above and which does not establish that Spencer procured the employment for McCullough.

The question on this branch of the case is, therefore, whether solicitation of employment for McCullough by Spencer when no cases were brought to McCullough thereby, but where McCullough and Spencer were closely associated in the handling of personal injury cases in all their aspects and where McCullough heard rumors that Spencer was soliciting for him is sufficient to establish the plaintiff's professional misconduct in employing a "runner" or "ambulance chaser" to solicit business. McCullough testified that he talked to Spencer about the rumors of soliciting and Spencer told him he was not doing it; McCullough told him he was not to do it. Spencer's services were discontinued and he found new office space after the President of the Utah State Bar suggested its advisability in 1937.

Over a period of nearly seven years, then, during which Spencer worked for and with McCullough the record discloses three instances of solicitation by Spencer in which

McCullough's name was used. These occurred in January, 1934 (Wunderli), October, 1933 (Woodland), and November, 1933 (Beitel). It is not shown that McCullough requested or knew about the solicitation or that anything occurred to him as a result. Our attention has been called to no instance in which an attorney was suspended or disbarred on such meager evidence of solicitation through a runner. See *State* v. *Rubin*, supra, at page 32 of 201 Wis., at page 37 of 229 N. W.; *Fish* v. *State Bar of California*, supra; *In re Sizer*, 306 Mo. 356, 379, 385, 387, 267 S. W. 922, 929, 932; *In re Levine*, 210 App. Div. 8, 205 N. Y. S. 589; *In re Mahan*, 228 App. Div. 241, 239 N. Y. S. 392; *In re Seidman*, 228 App. Div. 515, 240 N. Y. S. 592; *In re Kreindler*, 228 App. Div. 492, 240 N. Y. S. 604; *Edwin P. Werner* v. *State Bar of California*, Cal. Sup., 91 P. 2d 881.

The plaintiff is an attorney of extensive practice and one who well knows the rules and standards of practice exacted of attorneys in this state. Despite this, his close association with a personal injury investigator has been such as to arouse suspicion and start rumors of "ambulance chasing." It was not until the President of the State ■ Bar spoke plainly to plaintiff and suggested that the relationship be terminated that plaintiff parted company with his investigator. However, the evidence adduced is consistent with a relationship between the two which, though it laid a fertile field for suspicion and rumor, which in fact flourished, is consistent with lack of knowledge upon the part of plaintiff of the conduct of his alleged co-worker. The fact that of the comparatively large number of personal injury cases shown by the record to have been filed by plaintiff during the period while he and Spencer had joint office arrangements, no instance of solicitation by the latter was shown by clear and convincing evidence to have occurred by direction of or with the knowledge of the plaintiff, impels us to the conclusion that the solicitation thus charged has not been established. Nevertheless for maintaining a relationship so pregnant of suspicion and rumor

over a period of several years and for knowingly permitting these suspicions and rumors to circulate unimpeded, plaintiff deserves the censure of this court.

Plaintiff is also charged with soliciting cases in his own behalf in a manner constituting unprofessional conduct—charges (b) and (g). Charge (b) was found not sustained by both the Disciplinary Committee and the Board of Commissioners, and we think correctly so. As to charge (g), which alleged unprofessional conduct on the part of plaintiff both by personal solicitation and solicitation through Sid Spencer, the Disciplinary Committee found no solicitation through Sid Spencer. The Board of Commissioners made a general finding of the facts, sustaining the charge. We think the evidence insufficient to sustain a finding of solicitation through Sid Spencer. The evidence with respect to plaintiff's conduct in the case of a woman whose husband was killed near St. George while enroute with his wife and children to his home in Arizona, which, it is claimed, sustains a finding of personal solicitation is as follows:

Plaintiff testified that on the afternoon of October 7, 1935, one Ben Lingenfelter called him from St. George saying that the widow of a man who had been killed had asked a Mrs. Hale to have plaintiff come down to St. George and to come quickly as she wanted to leave with the body for Phoenix. Plaintiff replied that he was in court but would come as quickly as possible; that plaintiff and Spencer went, arriving in St. George between 2:00 and 3:00 o'clock a. m.; that they got in touch with Mrs. Hale at the Liberty Hotel; that she said the widow, a Mrs. Sutfin, had requested her to call him but had decided he wasn't coming and had left soon after midnight; that he (plaintiff) went to Santa Clara to see Ben Lingenfelter, in the State Highway Patrol checking station; that Lingenfelter said Mrs. Sutfin was on her way but that he knew the sheriff in Las Vegas and could have the truck stopped; that Lingenfelter called the sheriff in Las Vegas telling him that the attorneys from Salt Lake City were on their way to Las Vegas and, describing the

truck and its occupants, asked him to give that information to Mrs. Sutfin and tell her to meet them at the police station in Las Vegas; that he (plaintiff) and Spencer went to Las Vegas and met the party at the police station and that he talked to Mrs. Sutfin, either alone or with Spencer only; that Mrs. Sutfin asked if he were connected with the Dixie Power Company (whose truck had struck the Sutfin car), asked about attorney Pickett's connection with the Power Company, and said she had employed no one to represent her; that he told her she was in no condition to employ a lawyer and advised her to continue on, that he would make an investigation in St. George which would be available to any lawyer who handled the case and that after she had buried her husband she could call him or write to him, which she said she would do; that someone passed a note in to her saying that they had a lawyer for her; that he and Spencer made an investigation in St. George and also learned that Mr. Pickett claimed to have been employed on the case; that on October 9, 1935, on the day after he returned to Salt Lake City he (McCullough) wrote a letter to Mrs. Sutfin. Mrs. Sutfin later got in touch with McCullough and he handled the case for her and effected a substantial settlement.

Sheriff Joe Keate of Las Vegas stated that he received the phone call from Santa Clara in the early morning of October 8, 1935; that he was to stop a described truck which was carrying a dead man "and that two men were coming after them—to hold truck and occupants upon their arrival." He thought it was murder or some such but after questioning the occupants he informed his deputy they had no authority for holding them.

Homer E. Grove, a deputy sheriff at Las Vegas, testified that about 3:30 a. m. of October 8, 1935, his superior called him, saying he had received a phone call from a state officer at Santa Clara and instructed him to go out and stop the described truck; that he intercepted the truck and took the people in it to Las Vegas and held them there pending the

arrival of McCullough and Spencer about an hour later; that McCullough explained he had arrived too late to intercept them in St. George and had had somebody call the sheriff in Las Vegas; that McCullough said, after the Sutfins had gone, that they weren't getting a square deal in St. George from the people that were advising her. He believes the name of Ellis Pickett was mentioned.

Gerald Blake, who drove the truck carrying the Sutfins to Phoenix, testified that Mrs. Sutfin did not mention to him waiting in St. George for anyone to come; that enroute to Las Vegas she mentioned Pickett whom Mrs. Hale had wanted her to employ and said she trusted no lawyer in the State of Utah and would employ none until she reached Phoenix; that they were stopped outside of Las Vegas by Deputy Sheriff Grove who took them to the police station and said they were held for investigation because of a call from Utah and that while they were waiting Mr. Grove accompanied them to breakfast; that McCullough, after his arrival, said he wanted to get the case and asked to speak with Mrs. Sutfin alone, that he was the one who had put in the phone call; that someone passed a note in to Mrs. Sutfin while she was talking to McCullough advising her to do nothing then but to think it over.

Ellis J. Pickett, a St. George attorney, testified that Mr. Hale of the Liberty Hotel called him and asked him to come and see Mrs. Sutfin; that he talked to her for about twenty-five minutes the evening before she left to go to Phoenix and that she made a verbal agreement to hire him, and discussed the terms; that the next morning he investigated the accident and took some pictures; that later that morning McCullough talked to him, saying he had just returned from Las Vegas; that Pickett stated Mrs. Sutfin had employed him but McCullough stated she had employed no one and suggested that they might work together on the case; that he had no connection whatever with the Dixie Power Company.

Ben Lingenfelter testified that Mrs. Hale talked to him about attorneys for Mrs. Sutfin and mentioned Mr. McCullough and Mr. Gustin, and that he told her McCullough had handled more such cases and suggested that he call McCullough, which he did; that he told Mrs. Hale he had done so and believes she told Mrs. Sutfin; that when Gerald Blake and Mrs. Sutfin passed his checking station that night he did not tell them an attorney in Salt Lake City had been called and was coming; that McCullough and Spencer came later and Lingenfelter suggested that he could have Sheriff Keate stop her and tell her that the attorney from Salt Lake City was on his way to Las Vegas and to ask her to wait at the police station; that this call was put in although McCullough was rather hesitant about it.

This testimony establishes that after a talk with Mrs. Hale, Lingenfelter called McCullough and suggested that he come down; Mrs. Sutfin then talked with Pickett and either employed him or tentatively employed him and left for Phoenix about midnight; McCullough arrived two or three hours later and learned from Mrs. Hale that Mrs. Sutfin, her two children, and her husband's corpse had left in a truck for Phoenix via Las Vegas; he drove to Santa Clara to see Lingenfelter who put in a call to Las Vegas to stop the truck and either hold the occupants or ask them to stay; he then drove to Las Vegas and talked to Mrs. Sutfin about the accident and about employing counsel, and returned to St. George where he discussed the case with Pickett and learned that he claimed to have been retained by Mrs. Sutfin. McCullough made an investigation in St. George and the next day wrote a letter to Mrs. Sutfin although he had told her to get in touch with him after her arrival in Phoenix. This letter admits that the writer had not been employed but was seeking employment in the case and advances many reasons why he should be employed. After relating the evidence which had been procured in St. George the letter states:

"* * * We have the sheriff's report and the State Highway report of the entire accident. Mr. Ben Lingenfelter is very favorable toward

you. He is a dear friend of the writer, and will make an exceptionally fine witness.

"* * * We spent practically all day yesterday in gathering up evidence which will be most favorable toward you.

"It would be useless to try this case in St. George as the Southern Utah Power Company is too strong in that locality and Mr. Jones is too well known in that community for a stranger to get an impartial trial. Inasmuch as you are not a resident of Utah, you are entitled to have your case tried in the United States Federal Court at Salt Lake City. There is little question but that a sizeable verdict will be forthcoming if the case is properly prepared and tried by a competent lawyer.

"We talked with Mrs. Hales about Attorney Pickett and she informed us that she simply introduced you to him without knowing anything concerning his connections with the Power Company. We do not care to discuss the merits or demerits of Mr. Pickett or any other lawyer. * * * The writer has been trying personal injury cases for sixteen years, and we are specializing in this type of work exclusively.

"We shall be very pleased to take your case on a contingent basis of 25% of what we recover without suit and 50% of whatever sum or money is recovered with suit. Please find enclosed our usual contract * * *"

This case offers a clear example of solicitation. The conduct of plaintiff in making the journey to St. George in response to the relayed request of Mrs. Sutfin is not questioned. But finding that the potential client had evidently concluded not to employ him or to contact him relative to employment, his subsequent conduct in having a widow taking the dead body of her husband to her home in another state detained in Las Vegas by an officer of the law in order that he might interview her, his talk with her at the jail, his statement to Pickett later that no one had been employed, and his letter to the widow extolling his own abilities and belittling those of a fellow lawyer and casting innuendo about his connection with the Power Company, constitutes such an example of solicitation as must not go unrebuked. It is unprofessional conduct which no court could pass over lightly. The finding of misconduct as to this charge is sup-

ported by the evidence. *Fish* v. *State Bar of California, supra.*

The plaintiff was charged with unprofessional conduct in his handling of the case of Harry E. Erickson, who was charged with a felony and who had been released to the custody of the plaintiff. The plaintiff was charged—charges (k), (l), and (m)—with counseling Erickson to leave the state while the charge was pending, with refusing to divulge to the court, the sheriff's office or the county attorney the whereabouts of Erickson, and with testifying falsely that he had not seen or talked to Erickson since a certain date and did not know his whereabouts or how he could be reached. Both the Disciplinary Committee and the Board of Commissioners found the first charge not sustained but found against the plaintiff on the other two, i. e., refusing to divulge knowledge and testifying falsely. Actually, the finding of the Board of Commissioners goes only to McCullough's evasiveness before the city court when asked about Erickson's whereabouts. We must determine whether the record establishes a withholding of information about Erickson, and if so, whether such was unprofessional conduct.

The Committee and the Board correctly found that the charge of telling Erickson to leave the state was not sustained, since the proof shows only that the plaintiff passed on to Erickson the counsel of the county attorney who believed the case could be dismissed on those terms, and the plaintiff told Erickson to see him before he left.

Was McCullough's testifying in the contempt case such as to constitute unprofessional conduct? Since he had a duty, as an attorney, to be forthright and candid, evasiveness would have been a departure from that duty. The plaintiff makes several answers by way of explanation and justification. He argues (1) that his testimony was full and complete; (2) that even if it was not he is not liable to discipline because he was preserving confidential information of a client; and (3) that the judge was without jurisdiction

to find the plaintiff in contempt in the proceedings wherein the testimony was given. The latter questions do not come before us unless we first find that plaintiff's answers were evasive and constituted wrongful conduct for an attorney.

The questioned testimony was given before Judge Leverich of the Salt Lake City Court on April 14, 1937, in a proceeding against McCullough charging him with contempt of the lawful orders of the court in counseling and advising a defendant released to his custody to leave the State of Utah. The prisoner had left the state, and at the time of the contempt hearing had not been apprehended. In the official report of the contempt proceeding, introduced in evidence at the hearing before the Committee, this testimony appears:

"Q. Did you have any direct communication with him at any time after the morning of Thursday, March the 5th? A. No.

"Q. On March the 4th? A. No. I never talked with Mr. Erickson after the morning of Thursday, March the 4th, at 9 o'clock, 9:20 and 9:30 in the morning."

It is apparent from the record that this testimony related only to advising Erickson to leave town and therefore pertained only to the time prior to March 6th, since the next question was:

"I will ask you, Mr. McCullough, whether you have ever given Mr. Erickson any instructions about leaving town, other than those you have now related to the court?"

The same is true of the answer:

"I never had any personal conversation with Mr. Erickson after Thursday morning at 9:30."

Other testimony at such hearing purporting to give all the information McCullough had up to that time is:

"Q. Have you in any manner, directly or indirectly, advised Mr. Erickson to leave town, or not to appear in court? A. No, sir.

"Q. Do you know where he is now? A. From my own knowledge, no.

"Q. Well, just what information have you with reference to that, either your own knowledge, hearsay, or anything else? A. On Monday

I called up the place where he was at, when I talked with Judge Ellett. We called up the place where he was staying, and they said he had left for California on Saturday morning.

"Q. Is that all the information you have?  A. That is all the information I have except that I understand from his father, he was going to stay with his relatives down there in California. Where his relatives live I don't know."

"Q. You want the Court to understand that you did not tell him that you knew where the defendant was at that time?  A. No, I did not tell him that. I don't know now where he is. I don't know now where he is (Repeated) except by hearsay. I have not seen the defendant. I don't know whether he is in California or not."

"Q. Isn't it a fact that you said to me that you wished that I would dismiss the case; that the defendant is down there, that you knew where he was, and that you could get him back; and that you were going down in a couple of weeks, and that you would get him back? A. I made this statement—not in that language Judge—I don't want to be misunderstood. Of course, when we are talking outside of the rules of evidence, I may have used the statement about that I knew he was in California. If that statement was made, it was made with the understanding I had information that he was in the State of California."

"* * * I know that long before he ever left that was his intention of going to California. * * * I knew he was going to California. * * *"

"* * * I knew he was all ready to go. I knew he anticipated going to California. I know he told me that, he and his wife. They did not need to tell me any more than that. Any expression I made to you would naturally be predicated on the situation precedent. I think I explained that to you, that he was down there with his relatives, but I don't recall ever saying that I knew where his relatives live, because I don't now."

The foregoing testimony must be read in the light of the fact that Erickson was released by the court to McCullough and, hence, that the latter had the duty of producing him if possible.

McCullough's own testimony before the Investigating Committee shows that he could have amplified his information about Erickson. His last face to face conversation with Erickson prior to April 14th was on Wednesday, March 3rd. On Thursday, March 4th, the plaintiff called Erickson on the phone from the county attorney's office and told him the

case was to be moved for dismissal on condition that Erickson would leave town, but that he should not leave without seeing the plaintiff. Erickson left town on Saturday the 6th of March. On Monday, the 8th, McCullough wrote to a firm of attorneys in California telling them that Erickson had gone to California and would probably be in to see them. On March 9th, after relatives of Erickson had telephoned, he called McCullough on the telephone early in the morning at McCullough's home. Erickson said he was in Los Angeles, going under an assumed name, and would not return to Utah. Erickson called again on March 25th because he had been told, upon appearing at the Musicians' Union in Los Angeles, that the Sheriff was looking for him, and that he was with his relatives at Riverside. After the hearing on April 14th, McCullough demanded and obtained from Erickson's relatives in Salt Lake City, the phone number at which Erickson could be reached in Riverside, California, which number he called and, since Erickson was out, asked to have him call plaintiff on his return, which Erickson did.

Thus it is plain that McCullough withheld testimony at the hearing on April 14th. He did not inform the court that he had talked with Erickson on March 9th and 25th and that Erickson had stated on both occasions that he was in Los Angeles and in the second one that he was with relatives in Riverside. He did not state that he had written to a California attorney that Erickson would probably come to see him. He did not state that the relatives of Erickson in Salt Lake City could reach Erickson by telephone as they had done for McCullough twice. As proof that he could do so McCullough promptly demanded and obtained the way to reach Erickson by telephone. His testimony shielded all these things under statements that he had only hearsay knowledge of Erickson's whereabouts.

At the hearing before the Disciplinary Committee the plaintiff made several explanations of these answers given at the contempt hearing. He stated that he gave all the information he had at that time, which was not true, as above

shown. He stated that he was not asked for telephone conversations, which was an obvious makeshift because he also testified that on April 14th he did not have in mind the difference between personal and telephone conversations. He quibbled by saying that even though he might have known where Erickson was on March 9th and 25th he did not, from that, know where he was on April 14th. He stated that the communications from Erickson were privileged, although at the hearing on April 14th no such claim was made for withholding information.

This variety of explanations is itself strong confirmation of the obvious fact that McCullough was not candid with the court at the hearing on April 14th and that he withheld information under the shield of evasiveness.

The claim, now urged, of privilege because of the attorney-client relationship, to be available must be asserted at the time the question calling for such information is asked; the witness cannot pretend to withhold nothing and then, when confronted with facts, claim that they were withheld because of a confidential relationship. Although such conduct might not support a charge of contempt, it is yet such conduct as, in an attorney, shows disrespect for the court and lack of respect for the attorney's oath, and is therefore unprofessional conduct.

The foregoing is on the assumption that the claim of privilege might properly have been interposed. That such claim is not sustainable is the contention of the Board of Commissioners, citing for our approval opinion 155 of the American Bar Association, as follows:

"Attorney and Client—It is the duty of an attorney to disclose to the proper authorities his information as to the whereabouts of a client who, having fled the jurisdiction of the court while on bail after indictment, failed to appear for trial, and who has remained absent from the jurisdiction for several months, living elsewhere under an assumed name. If the attorney fails to do so, he may be disciplined."

Certainly under the circumstances of this case, where the attorney had the duty of producing his client, there can be but little doubt as to such opinion stating the correct rule.

It is urged by the plaintiff that the contempt proceeding of April 14, 1937, was a nullity since it arose out of McCullough's conduct in State v. Harry Erickson on a charge of a felony; that the city judge therefore had no jurisdiction except as a committing magistrate and that failure to obey his orders was not contempt of court. However that may be, on April 13th and 14th the hearings were before a city judge having jurisdiction of contempt proceedings and whether the offense with which McCullough was charged had been committed was immaterial so far as his demeanor on the witness stand was concerned. The argument that there was no jurisdiction of the felony case after motion of the county attorney to dismiss is likewise not valid because immaterial to the conduct here being considered. The contempt proceeding was a proceeding separate and distinct from that out of which the contempt proceeding arose. *Jones* v. *Cox, Judge,* 84 Utah 568, 571, 37 P. 2d 777. And even if the city court had no jurisdiction of the offense charged on April 14th, it was still a court such that a contempt could be committed in its presence and to which plaintiff owed the respect exacted of attorneys at law. *United States* v. *Shipp,* 203 U. S. 563, 27 S. Ct. 165, 51 L. Ed. 319, 8 Ann. Cas. 265; 6 R. C. L. 506. Further, as hereinabove stated, McCullough was under the obligation of producing the defendant for trial, and his failure to reveal information as to his whereabouts was a violation of such duty.

The plaintiff is guilty of unprofessional conduct both in soliciting personal injury litigation and in failing to uphold the dignity of the courts and the standards of the profession by withholding information from the court when charged with contempt. Rules 22, 28, and 29 of the Revised Rules of Professional Conduct of the Utah State Bar. He also deserves censure for his close association with Sid Spencer who solicited personal injury cases,

using McCullough's name, rumors of which reached McCullough.

Both the Disciplinary Committee and the Board of Commissioners recommended suspension from the practice of law for a period of two years and until the plaintiff meets the conditions set out in paragraph two above. In view of the findings of the able and eminent members of the Bar constituting the Committee and the Board, the suspension recommended would not be too severe. However, since this court has concluded the serious charge of "ambulance chasing", through Spencer, not sustained, we are of the opinion that two years suspension would be excessive.

A single act of solicitation by an attorney such as is shown by the record in this case, while not to be condoned, is not fraught with such consequences as is the studied practice of procuring business through a paid solicitor. Each such act is condemned by the statutes of this state as a crime. Section 6-0-26, R. S. U. 1933. The practice seriously undermines the confidence of the public in the Bar and in the courts. The paid solicitor whose financial success depends upon the number of cases he can secure for his employer or partner, and the amount of the settlement or verdict that can be obtained, tends to become, as does his colaborer, a "mere grubber for money in the muck heaps of the world." He is subject to no code of ethics and subscribes to no professional oath. It is well known to the Bar generally that the tendency of one engaged in this frequently lucrative occupation is to make evidence where that found will not support a case and that stirring up litigation, contrary to concepts of justice long recognized, is not the greatest of the evil consequences of his activities. The cases on solicitation are replete with examples which reveal such tendency.

We make these observations in view of the fact that we have concluded that the evidence here is not such as to convince the court of plaintiff's guilt in this respect and to emphasize the fact that the judgment here pronounced is in a case where the charges involving the practice discussed are

held not proved. Nevertheless, the charges found sustained are serious and the conduct of plaintiff such that mere censure would constitute indulgence.

In addition to suspension for a definite period, the Board of Commissioners recommended that such suspension continue until plaintiff "satisfies the Bar that he is a fit and proper person, both morally and in the knowledge of the law, to be reinstated." We see no reason for including in the order of suspension that it continue in force until plaintiff satisfies the Bar that he has such knowledge of the law as to justify his reinstatement. No question is raised in these proceedings as to his qualification in this respect. Nothing in the record evidences a lack of such knowledge. Plaintiff has practiced before the Bar of this court for almost twenty years. The period of suspension determined upon is not such as to justify such requirement. Neither is his moral fitness involved, except in so far as the term "moral fitness" includes his professional conduct and attitude as revealed by the charges herein sustained.

It is the judgment of this court that R. Verne McCullough be and he is hereby suspended from the practice of law for the period of nine months from the going down of the remittitur herein to the Utah State Bar, and until he is reinstated upon application to that body; and that he pay to the Utah State Bar all costs expended by it in its prosecution of the charges. During the period of suspension he is forbidden to practice law, directly or indirectly through association with another attorney, from maintaining an office as an attorney, and from holding himself out as entitled to practice law in any of its phases. Upon application for reinstatement he shall satisfy the court through the Board of Commissioners of the Utah State Bar, both by his conduct during the period of suspension and by assurance then given, that he will not, if reinstated, be guilty of such conduct as that involved in the charges sustained herein.

WOLFE, J., concurs.

MOFFAT, Chief Justice (concurring).

I concur in the result. I concur generally with what is stated in the prevailing opinion. I also approve the limitations suggested by Mr. Justice PRATT.

LARSON, Justice (concurring).

There are some things said in the prevailing opinion both in favor of and against the defendant with which I do not concur. However, in view of the conclusions reached by the court in this matter I concur in the order made.

PRATT, Justice (concurring.)

I concur generally with what has been stated in the prevailing opinion. There is, however, one part with which I do not agree, that appeals to me of sufficient importance to justify comemnt. That is the treatment of the Sutfin case.

It, I believe, should not be treated as one of unprofessional conduct by solicitation. McCullough knew nothing of this case until the desires of Mrs. Sutfin, or what were said to be her desires, were relayed to him over the phone by Mr. Lingenfelter. The evidence justified a conclusion on his part that she did wish to see him. She had waited quite some time at St. George, Utah. He was delayed, and, as a result, arrived after her departure. Plaintiff was chided by Mr. Lingenfelter for being so late. It was the latter who suggested the telephone call to Las Vegas, Nevada, to have Mrs. Sutfin notified to await McCullough's arrival. That the Nevada sheriff misunderstood Lingenfelter's call or that Lingenfelter gave the sheriff the wrong information which led to an erroneous arrest of Mrs. Sutfin, should not be charged to McCullough as evidence of an intent on his part to force himself upon her. It does not appear that she was antagonistic to him when he arrived in Las Vegas. She was unsettled as to what to do until she consulted her counsel in Arizona. Plaintiff was not then employed. He returned home, and later wrote the letter quoted in the pre-

vailing opinion. McCullough was not the moving party in this case. He carried out the requests and suggestions of others who had had contact directly or indirectly with Mrs. Sutfin. There is nothing to show any relationship between Lingenfelter and McCullough except friendship.

I do not, however, uphold his letter. Whether carelessly or intentionally so worded, it strongly conveys improper suggestions as to the status of attorney Pickett. It is quite apparent how it would easily undermine any possible consideration of the latter by Mrs. Sutfin. That the reference to Mr. Pickett is in the form of information coming from another does not excuse it. The necessity for including any reference to another attorney was so minor as compared with its harmful potentialities, that it is not to be wondered one considers it with skepticism. Whether uttered or written in solicitation of a case, or under circumstances where the client sought the attorney, it is equally subject to a severe censureship. But it alone should not necessarily make that solicitation which, without it, is not. Aside from this reference to Mr. Pickett, the letter expresses no more than might well be expressed between an attorney and a prospective client who have met at the client's suggestion to determine whether the attorney shall be employed.

The case of *Fish* v. *State Bar of California*, 214 Cal. 215, 4 P. 2d 937, cited in the prevailing opinion, gives good examples of solicitation, personally, as well as through an agent. But those facts do not fit the subject matter of this discussion.